CONFORM

FILED

1 | VENABLE LLP
2 | BEN D. WHITWELL (Cal. Bar No. 138426)
CHRISTOPHER T. WILLIAMS (Cal. Bar No. 171907)
3 | 2049 Century Park East, Suite 2100
Los Angeles, CA 90067
4 | Telephone: (310) 229-9900
Facsimile: (310) 229-9901

10 SEP 21  PM 3: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

5 | ARI N. ROTHMAN (*Pro Hac Vice Application to be Filed*)
6 | JOANN E. WALKER (*Pro Hac Vice Application to be Filed*)
575 7th Street, NW
7 | Washington, DC 20004
Telephone: (202) 344-4000
8 | Facsimile: (202) 344-8300

9 | Attorneys for Plaintiff
Merchant Max, Inc.

10

11 | UNITED STATES DISTRICT COURT

12 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14 | MERCHANT MAX, INC.,

15 |        Plaintiff,

16 | vs.

17 |

18 | CURE TECHNOLOGIES, INC.,

19 |        Defendant.

20

**CV10  7042 DDP**   (Ex)

CASE NO. _____

**COMPLAINT FOR: BREACH OF WRITTEN CONTRACT; DEMAND FOR JURY TRIAL;**

**AND**

**DEMAND FOR JURY TRIAL**

21

22

23

24

25

26 |        Plaintiff Merchant Max, Inc. ("Merchant Max") alleges for its Complaint

27 | against Cure Technologies, Inc. ("Cure") as follows:

28

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 — FAX (310) 229-9901

-1-

COMPLAINT

CONFORM

FILED

VENABLE LLP
BEN D. WHITWELL (Cal. Bar No. 138426)
CHRISTOPHER T. WILLIAMS (Cal. Bar No. 171907)
2049 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 229-9900
Facsimile:   (310) 229-9901

10 SEP 21  PM 3: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

ARI N. ROTHMAN (*Pro Hac Vice Application to be Filed*)
JOANN E. WALKER (*Pro Hac Vice Application to be Filed*)
575 7th Street, NW
Washington, DC 20004
Telephone:  (202) 344-4000
Facsimile:   (202) 344-8300

Attorneys for Plaintiff
Merchant Max, Inc.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERCHANT MAX, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CURE TECHNOLOGIES, INC., <br><br> Defendant. | CV10  7042 DDP  (Ex) <br><br> CASE NO. _____ <br><br> **COMPLAINT FOR: BREACH OF WRITTEN CONTRACT; DEMAND FOR JURY TRIAL;** <br><br> **AND** <br><br> **DEMAND FOR JURY TRIAL** |

    Plaintiff Merchant Max, Inc. ("Merchant Max") alleges for its Complaint

against Cure Technologies, Inc. ("Cure") as follows:

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-1-

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

## INTRODUCTION

1. Defendant Cure Technologies, Inc. failed to provide Merchant Max, Inc. and Merchant Max's clients a fully functional and reliable credit card processing gateway pursuant to a written contract referred to herein as the "Joint Services Agreement" or "JSA." Specifically, Cure contracted to provide Merchant Max a "gateway" system so that Merchant Max could, in turn, provide credit card processing services to Merchant Max's clients that accept credit (and debit) cards as forms of payment for goods and services they sell on the Internet. Rather than providing the gateway system required by the JSA, Cure's staff, led by its Chief Executive Officer Colin Sholes, cobbled together a defective and erratic gateway system replete with errors, delays, bugs, faults, crashes and other innumerable problems, many of which exist to this day. Cure then failed to address many of these problems and delayed addressing others. Consequently, and among other things, Merchant Max lost millions of dollars in revenue because Merchant Max could not process transactions with a major European bank; Merchant Max clients stopped increasing use of Merchant Max's services, thereby resulting in hundreds of thousands of dollars in lost profits; Merchant Max wasted valuable resources constantly addressing problems with Cure's gateway that never should have occurred; Merchant Max was forced to build its own replacement gateway system at a cost of hundreds of thousands of dollars; and Merchant Max's reputation as a leader in the credit card processing industry has been harmed.

2. Cure also stole business from Merchant Max. While the JSA expressly prohibits Cure from entering into any contractual relationships with merchant banks, Cure entered into a relationship with at least one merchant bank and processed hundreds of thousands of dollars of transactions for which Merchant Max should have been paid but which Cure diverted to itself and pocketed.

-2-

3.     In light of Merchant Max's failures and abject refusals to abide by the express terms of the JSA, Merchant Max sues Cure for breach of written contract, and seeks monetary damages, attorneys' fees as permitted under the JSA, and other relief requested herein.

## PARTIES

4.     Plaintiff Merchant Max, Inc. is a California corporation with its principal place of business in Sherman Oaks, California.

5.     Defendant Cure Technologies, Inc. is a British Columbia corporation with its principal place of business in North Vancouver, British Columbia, Canada.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because this is a civil action where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State (Merchant Max) and a citizen of a foreign state (Cure).

7.     This Court has personal jurisdiction over Cure under Cal. Code of Civil Procedure § 410.10 because exercising personal jurisdiction over Cure is not inconsistent with the Constitution of this state or of the United States. Among other things, Cure in the JSA "agree[d] to the personal and subject matter jurisdiction of the courts of California." (Ex. A, JSA at § 11.10.) Further, Cure had systematic and continuous contacts in California by virtue of its contractual relationship with Merchant Max, and because it caused harm to Merchant Max which is located in California.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Merchant Max's claim against Cure occurred in this judicial district. Venue is also proper pursuant to 28 U.S.C. § 1391(a)(3) because Cure is subject to

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-3-

personal jurisdiction in this judicial district and because there is no judicial district in which this action may otherwise be brought.

## GENERAL ALLEGATIONS

### Services Offered by Merchant Max to its Merchant-Clients

9.   Merchant Max provides credit card processing services to its merchant-clients that sell goods and services over the Internet.  Merchant Max's services, in turn, allow merchants to accept credit cards as forms of payments for purchases made by consumers of the goods and services sold by the merchants.

10.   At the outset, Merchant Max and its merchant-clients typically enter into a written agreement whereby Merchant Max establishes a merchant account with a merchant bank on the merchant's behalf.  The merchant bank is the bank that handles acceptance and payment of credit card transactions, and ultimately transfers money to the merchant resulting from sales the merchant made.

11.   Once the merchant account is established and other formalities are fulfilled, the merchant may start accepting credit cards as forms of payment on their Internet websites using Merchant Max's processing services.  Usually, the consumer will enter his/her card information on an Internet web page hosted by the merchant, and that information will then be routed through a "gateway" system provided by Merchant Max.   The credit card and other pertinent information is then routed to relevant financial institutions (such as merchant banks) for authorization, rejection, clearing and/or settlement purposes.

12.   After a series of additional transactions and exchanges between the merchant, merchant bank, and other financial institutions, Merchant Max facilitates payment to the merchant resulting from sales the merchant made over the Internet via credit card transactions.   The amount of money that the merchant receives is typically the amount charged to the credit card and debit

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-4-

card of the consumers for the goods and services purchased minus refunds, chargebacks, fines, fees, charges or commissions to be paid to financial institutions, and fees due to Merchant Max.

13. Merchant Max also facilitates refunds, chargebacks, and adjustments concerning credit card transactions.

14. To facilitate the processing of credit cards and debit cards explained above, Merchant Max uses and provides its merchant-clients with access to an online interface known as a "gateway" which, among other things, is intended to provide data and reports concerning the credit card and debit card transactions. The specific data that the gateway is intended to provide includes the volume and monetary amounts of charges, refunds, chargebacks, and fees. Merchant Max's merchant-clients demand and require accurate and timely information concerning charges, refunds, chargebacks, and adjustments so that they can predict their income and expenses to operate their businesses, and to ensure compliance with applicable rules, laws, and regulations. The gateway is also intended to interface and exchange data with banks, including merchant banks, to ensure complete and timely flow of data needed to process card transactions and ultimately ensure that the merchants are paid for the sales they made on the Internet.

15. In exchange for the services Merchant Max provides to its merchant-clients, the merchant-clients agree to pay Merchant Max a fee for each credit card and debit card transaction processed through Merchant Max.

### Services Cure Technologies, Inc. Purports to Provide

16. Cure purports to offer "gateway" services. The "gateway" which Cure purports to offer is an on-line interface which is intended to provide merchants with accurate and timely data concerning credit card and debit card transactions initiated by consumers on the Internet websites of the merchants, and facilitate the processing of credit card and debit card transactions. The data

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-5-

1   specifically includes the volume and monetary amounts of charges, refunds,

2   chargebacks, and fees.   The gateway also purports to interface with banks,

3   including merchant banks, to ensure the complete and timely flow of data

4   needed to process credit card payments, and ultimate payment to the merchants

5   for the sales they made on the Internet.   The gateway which Cure purported to

6   offer is referred to herein as the "Cure Gateway System."

7          17.    Colin Sholes is the Chief Executive Officer of Cure.  Colin Sholes,

8   along with Jeffrey Doss, Terrence Feng, and Carl Vernon, were responsible for

9   creating and maintaining the Cure Gateway System at all relevant times.

10                     **The Joint Services Agreement**

11         18.    On December 15, 2008, Cure and Merchant Max entered into the

12   written JSA under which Cure contracted to provide Merchant Max and its

13   merchant-clients a fully functional gateway system so that Merchant Max, in

14   turn, could provide gateway and processing services to Merchant Max's

15   merchant-clients.   Colin Sholes signed the JSA on Cure's behalf as Cure's

16   Chief Executive Officer.

17         19.    Cure further agreed in the JSA that "[t]hroughout the Term of this

18   Agreement, neither Cure, nor any of its officers, directors, shareholders,

19   affiliates, employees or independent contractors shall be permitted to enter into

20   any contractual relationship with any merchant bank for the provision of

21   merchant banking services for any of its or Max's customers, or otherwise deal

22   directly with any merchant bank with which Max has any relationship without

23   the prior written consent of Max." (Ex. A, JSA at § 5.)

24            **Cure Breaches the Joint Services Agreement**

25         20.    Cure failed to provide a fully functional and reliable gateway

26   system.   Instead, Cure provided the Cure Gateway System, which was and

27   continues to be stricken with errors, bugs, delays, crashes, and inaccurate

28

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-6-

COMPLAINT

reporting of information to the detriment of Merchant Max and its merchant-clients. For example, and among other things:

      a)    Cure failed to integrate its gateway with a major bank in Europe which Merchant Max intended to use as a merchant bank for its clients. Consequently, Merchant Max lost millions of dollars in revenues because Merchant Max could not process transactions through this bank.

      b)    The Cure Gateway System frequently failed to process credit card transactions, including refunds and chargebacks. In light of these failures, and as one example only, one client wrote "I simply can't keep on sending you guys [Merchant Max] this kind of volume if you can't even get your gateway to work proper[ly]."

      c)    The Cure Gateway System improperly processed credit card transactions. A Merchant Max client complained that "During the communications outage over the weekend transactions were again being processed even though they were erroring, and I've got another set of transactions that need to be refunded. And unfortunately unless you can guarantee me that the issue has been resolved we're going to have to stop sending new signups to you. This is causing us way too many problems."

      d)    Cure repeatedly tested alleged "upgrades" in a live environment without providing notice, and failed to handle "cancels" and "chargebacks" during these upgrades. After one of Merchant Max's customers complained about this, Colin Sholes acknowledged and validated the customer's complaints and admitted that "it is completely unacceptable" and offered a discount. The client declined the discount and proposed that Cure "take whatever discount [Cure] had in mind giving us and use that on employing another tech/programmer to ensure more stability from your side because if this keeps up we will be forced to look elsewhere to protect our own business."

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-7-

e)    The Cure Gateway System failed to timely settle transactions, and merchants were not notified about the delays until days later.  One of Merchant Max's merchant-clients wrote: "Cure is killing us, these transactions were from the 29th for christs sake!!  We cannot be held accountable for this nor will we ever be able to make our accounts right with this extreme lag."

f)    Cure failed to timely upload chargeback information.  While chargebacks must be uploaded daily so that Merchant Max's merchant-clients can project their revenues and cash flow, and avoid bank fines among other things, Cure would only upload them once a week.  Cure refused to correct this deficiency.

g)    Unannounced and frequent outages were common.  As one example only, Merchant Max reported 1,145 errors in a 46 minute time frame in December 2009.

h)    Cure failed to notify Merchant Max when Cure disabled certain features, such as chargeback processing.  Consequently, Merchant Max and its clients believed that the Cure Gateway System was processing chargebacks when, in fact, it was not doing so.  This prevented (or at least delayed) the processing of transactions, and provided misleading if not inaccurate information to merchants.

i)    The Cure Gateway System encountered processing delays.  One Merchant-Max client wrote "it's extremely slow for pretty much any site and it would appear that this is also having a negative effect on new signups on our end."

j)    The Cure Gateway System provided inaccurate transaction information.  For example, a major merchant bank with whom Merchant Max has processed millions of transactions, complained that "the totals that Cure.Net has are wrong," and that "[t]he problem is between mid-

-8-

May and June" for various merchants. This customer also complained about "incorrect matching and posting or responses from our side to other batches/merchant requests."

k) Merchant Max uploaded transactions to the Cure Gateway System but the transactions were not disclosed on reports that the Cure Gateway System was supposed to provide. Consequently, Merchant Max's clients could not see, and therefore did not know about, transactions that pertained to their businesses.

l) Cure failed to properly process "recurring" charges. For example, recurring charges were processed as initial charges, thereby delaying if not impeding payments to merchants for goods and services they sold over the Internet.

m) Merchant Max's clients complained that transaction searches took too long using the Cure Gateway System. One customer wrote that the delayed searches "continu[e] to cause us a massive headache to the point where it's crippling us from debugging customer issues on occasion" and that "We really need this to be fixed. I keep bringing it up and don't seem to be getting any real resolution to it."

21. Compounding the gateway's failures set forth above, Colin Sholes, failed to adequately staff and oversee Cure. For example, Cure routinely failed to answer any phone calls or emails when clients complained about the Cure Gateway System. And, when Cure did answer complaints, it did so after significant delays without any justification. Cure personnel also took a lavish company vacation in Hawaii soon after Cure signed the JSA, thereby abandoning its contractual commitments and the needs of Merchant Max and Merchant Max's customers, and confirming that Cure from the outset had no intention to provide anything resembling a fully functional and reliable gateway system.

-9-

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

22.   Without fully functional credit card processing technology, and without an adequate staff available at Cure to address problems associated with the Cure Gateway System, Merchant Max lost business opportunities, and could not adequately service existing clients or grow its business.   Accordingly, Cure's failures and material beaches of the JSA – only some of which are described herein – caused Merchant Max to lose future business with existing clients.  For example, after noting that "Cure gateway didn't sound interested in fixing or documenting their API [application programming interface, *i.e.,* the gateway]," a company that handled credit card transactions for one of Merchant Max's clients wrote to Merchant Max "Maxpayments is a dead end for me at this point.   Might look at Payvision, at least their API is documented and functional."    And, as alleged above, Merchant Max could not process transactions through a major European bank solely because of the failures associated with the Cure Gateway System.

23.   Merchant Max entered into the JSA so that Merchant Max would not have to create or maintain the Cure Gateway System or any similar system. However, Cure's failures to provide a fully functional and reliable gateway system, compounded by its failures to correct problems when they arose, frustrated the purpose of the JSA and caused additional damages to Merchant Max.  Among other things, Cure's failures forced Merchant Max to devote staff time to addressing and correcting technical problems associated with the Cure Gateway System instead of maintaining and growing its volume of business with existing and future customers.  Cure's failures also forced Merchant Max to create a completely new gateway system – something Merchant Max would not have done if Cure had simply fulfilled its contractual obligation to provide a fully functional gateway system.   Additionally, Cure's failures and breaches caused harm to its reputation, and caused Merchant Max to lose existing and future business.

-10-

24.    Cure breached the JSA in other ways, such as by stealing business from Merchant Max.    Specifically, Section 5 of the JSA provides that "[t]hroughout the Term of this Agreement, neither Cure, nor any of its officers, directors, shareholders, affiliates, employees or independent contractors shall be permitted to enter into any contractual relationship with any merchant bank for the provision of merchant banking services for any of its or Max's customers, or otherwise deal directly with any merchant bank with which Max has any relationship without the prior written consent of Max."    Without obtaining Merchant Max's prior written consent, Cure entered into a contractual relationship and/or dealt directly with merchant banks when it allowed a company called "Heritage" to use Cure's Gateway System.    As of the date of this complaint, Cure had processed hundreds of thousands of dollars for "Heritage" in violation of Section 5 of the JSA.

## FIRST CAUSE OF ACTION
### (Breach of Written Contract)

25.    Merchant Max re-alleges and incorporates by reference paragraphs 1 through 24 above as though fully set forth herein.

26.    Merchant Max and Cure entered into the Joint Services Agreement as alleged in Paragraph 18 above.

27.    The JSA is a valid written contract.

28.    Merchant Max performed all of its obligations under the terms and conditions of the Joint Services Agreement, except to the extent such obligations were excused by Cure's breaches of the Joint Services Agreement.

29.    The JSA required Cure to provide a fully functional and reliable gateway system so that Merchant Max could provide credit card processing services to Merchant Max's merchant-clients.  Merchant Max breached the JSA by failing to provide a fully functional and reliable gateway system as alleged in Paragraphs 20-23 herein, and through other failures that will be revealed in

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 — FAX (310) 229-9901

discovery. Cure's failures and breaches also frustrated the purpose of the JSA as alleged in Paragraphs 20-24 above.

30.   Cure breached Section 5 of the JSA by entering into a contractual relationship and/or dealing directly with merchant banks for the provision of merchant banking services in connection with a processor referred to as "Heritage" in the Cure Gateway System.

31.   As a direct and proximate result of the breaches of contract by Cure as alleged herein, Merchant Max has been damaged and will be damaged in a sum not yet fully ascertained but no less than $1,000,000. The damages Merchant Max incurred include but are not limited to costs associated with loss of staff time addressing Cure's technological deficiencies and building a new gateway; past, present, and future lost revenues and profits associated with loss of existing and future business; and Cure's breaches of Section 5 of the JSA as alleged herein.

32.   Section 11.7 of the Joint Services Agreement states "[i]f any legal action or arbitration or other proceeding is brought for the enforcement of this Agreement, or because if an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in the action or proceeding, in addition to any other relief to which it or they may be entitled." Accordingly, Merchant Max seeks and is entitled to its reasonable attorney's fees and other costs incurred in this action in addition to other relief to which it is entitled.

## **PRAYER FOR RELIEF**

Wherefore, Merchant Max prays for judgment as follows:

1.   For damages of at least $1,000,000, which damages will be established more fully according to proof at trial, but in excess of the jurisdictional limits of this Court;

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

-12-

2.     Attorneys' fees and costs under the Joint Services Agreement and
to the extent permitted by statute or law;

3.     Pre-judgment and Post-judgment interest; and

4.     Such further relief as the Court deems just and proper.


Dated:  September 21, 2010                VENABLE LLP


                                          By: _____
                                              Ben D. Whitwell
                                              Christopher T. Williams

                                          Attorneys for Plaintiff
                                          MERCHANT MAX, INC.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 – FAX (310) 229-9901

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Merchant Max demands a trial by jury as to all issues so triable.

Dated:  September 21, 2010          VENABLE LLP


By: _____
          Ben D. Whitwell
          Christopher T. Williams

Attorneys for Plaintiff
MERCHANT MAX, INC.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CALIFORNIA 90067
TEL (310) 229-9900 — FAX (310) 229-9901

-14-

**EXHIBIT A**

## JOINT SERVICES AGREEMENT

**THIS JOINT SERVICES AGREEMENT** ("Agreement") is entered into as of this 15
day of December, 2008, by and between CURE TECHNOLOGIES, INC. (herein "Cure"), a
corporation organized under the laws of the Province of British Columbia, and MERCHANT
MAX, INC. (herein "Max"), a corporation organized under the laws of the State of California.

### RECITALS

1.  Cure is engaged in the business of providing "gateway" services to merchants who
operate Internet websites and who effectuate sales of products and services over the Internet and
who accept payment for such products and services by means of credit cards. Cure provides,
inter alia, credit card data storage services, fraud detection and verification services, and an
account management and reporting system for its clients. All of the services Cure provides to its
clients are collectively known as the "Cure Gateway System."

2.  Max is engaged in the business of providing credit card processing services to
merchants who operate Internet websites and who effectuate the sales of products and services
over the Internet, including but not limited to interfacing with merchant banks, and providing
payment facilities, refunds, adjustments and account monitoring services to merchants.

3.  Max desires to use the Cure Gateway System and/or to make the Cure Gateway
System available to its clients, and Cure desires to make the Cure Gateway System available to
Max's existing and future clients, all on the terms and conditions contained herein.

4.  Max owns fifteen percent (15%) of all of the issued and outstanding common stock of
BLK Holdings LTD., which owns one hundred percent of the issued and outstanding shares of
Cure. The parties hereto desire to memorialize their relationship with respect to the shares of
Cure owned by Max.

-1

NOW, THEREFORE, in consideration of the foregoing premises, and of the mutual representations, promises, covenants and warranties herein contained, the parties hereto stipulate and agree as follows:

1. _Dual Methods of Using Cure Gateway System_. The parties hereto agree that there are two possible methods whereby a customer of Max may utilize the Cure Gateway System, and that this Agreement is intended to govern both such methods. The two methods are referred to herein as the "Separate Front-End Method" and the "Branded Front-End Method."

1.1 Under the Separate Front End Method, a customer of Max will contract directly with Cure for the use of the Cure Gateway System, and will deal directly with Cure. The customer will have direct access to Cure's website and direct access to Cure's databases in order to access and retrieve account and billing information. From the standpoint of the customer, Max's credit card processing services and the Cure Gateway System will be separate and distinct services which are independently operated and separately billed to the customer.

1.2 Under the Branded Front-End Method, the Cure Gateway System will be seamlessly integrated into and become part of Max's credit card processing services. A customer of Max will deal only with Max, and will access the Cure Gateway System only through Max's websites. The customer will not enter into any separate contracts or arrangements with Cure, but instead will deal exclusively with and be billed for services exclusively by Max.

2. _Fees Payable by Max to Cure_. The transactional fees that Max will be obligated to pay to Cure for the use of the Cure Gateway System will be dependent upon whether a customer utilizes the Separate Front-End Method or the Branded Front-End Method.

2.1 In the event that a customer utilizes the Branded Front-End Method, then Max shall be required to pay to Cure a fixed fee of US $0.075 (seven and one-half cents) for each

EXHIBIT A - 016

credit card transaction, regardless of the amount of the transaction, the amount charged by Max for its services in processing the credit card transaction, or any other variable.

2.2 In the event that a customer utilizes the Separate Front-End Method, then Max shall be required to pay to Cure a fixed fee of US $0.05 (five cents) for each credit card transaction, regardless of the amount of the transaction, the amount charged by Cure for the use of the Cure Gateway System, or any other variable.

3. Manner of Payment of Fees. Cure shall provide Max with an invoice on the first day and the fifteenth day of each month for fees claimed by Cure to be owed by Max to Cure pursuant to Section 2, hereinabove for transactions booked during the prior 15-day period. Each such invoice shall provide Max with a breakdown of fees owed per merchant I.D. number, and within each merchant I.D. number, the amount of fees owed under the Separate Front-End Method and the Branded Front-End Method. Max shall be required to pay Cure's invoice within five business days of receipt, unless Max protests Cure's invoice, in whole or in part.

4. Duties of the Parties. Each of the parties hereto shall use their best efforts to maximize the number of transactions utilizing the Cure Gateway System and Max's credit card processing services. Accordingly, each of the parties shall faithfully and diligently undertake the following actions throughout the Term of this Agreement:

4.1 Cure shall refer to Max any merchant who is using or proposing to use the Cure Gateway System and who might be interested in obtaining Max processing services. Cure shall have the right to refer a prospective merchant to another credit card processor only if and when such prospective merchant fails to enter into a contractual relationship with Max within 30 days of such referral.

4.2 Max shall first refer to Cure any merchant who is proposing to use Max's processing services and who might be interested in using the Cure Gateway System. Max shall

3

have the right to refer a prospective merchant to another credit card gateway provider only after Max has first referred such prospective merchant to Cure. The foregoing notwithstanding, in the event that a prospective customer for Max's services wishes to engage Max but who already has entered into an arrangement with an Internet gateway provider other than Cure, nothing contained herein shall prevent Max from dealing with such prospective customer. In addition, in the event that a gateway provider other than Cure refers a prospective customer to Max for its credit card processing services, Max shall not be required to refer any such customers to Cure.

5. <u>Prohibited Conduct.</u> Throughout the Term of this Agreement, neither Cure, nor any of its officers, directors, shareholders, affiliates, employees or independent contractors shall be permitted to enter any contractual relationship with any merchant bank for the provision of merchant banking services for any of its or Max's customers, or otherwise deal directly with any merchant bank with which Max has any relationship without the prior written consent of Max. For the purposes of this section, an "affiliate" is any person related by blood or marriage to any other prohibited person, or any beneficiary or trustee of any trust in which an affiliated person has an interest.

6. <u>Representations and Warranties of Cure.</u> Cure represents and warrants unto Max, which representations and warranties shall survive the Effective Date:

6.1 Cure holds all proprietary rights, title and interest in and to the Cure Gateway System, and all of the processes contained therein. Exhibit A, attached hereto, is a complete list of all trademarks, domain names, and patents which Cure owns or in which it claims an interest. Cure further represents and warrants unto Max that all of the scripts, source codes, object codes and other components of any and all websites maintained by Cure are owned by Cure. None of the trademarks, copyrights, patents, domain names or other intellectual property conflict with the property rights of any other person.

6.2 Cure is a corporation duly formed and validly existing under the laws of the

– 4 –

Province of British Columbia. All of the issued and outstanding shares of stock of Cure have been duly issued and paid for, and no person or entity has been granted any options to acquire any of shares of Cure.

6.3 This Agreement, and all of the actions contemplated hereunder, have been duly approved by the Board of Directors of Cure. Neither the execution nor the performance of any of the actions required of Cure shall cause the breach of any agreement, or the acceleration or cancellation of any indenture or indebtedness to which Cure is a party. The persons executing this Agreement on behalf of Cure have been authorized to do so, and have done so in their official capacities and within the scope of their authority.

6.4 To the best of Cure's knowledge, there are no claims, suits or proceedings which have been brought or which are pending or threatened relative to the conduct of Cure's business or operations.

7. Representations and Warranties of Max. Max represents and warrants unto Cure, which representations and warranties shall survive the Effective Date.

7.1 Max holds all proprietary rights, title and interest in and to its credit card processing system. Exhibit B, attached hereto, is a complete list of all trademarks, domain names, and patents which Max owns or in which it claims an interest. Max further represents and warrants unto Cure that all of the scripts, source codes, object codes and other components of any and all websites maintained by Max are owned by Max. None of the trademarks, copyrights, patents, domain names or other intellectual property conflict with the property rights of any other person.

7.2 Max is a corporation duly formed and validly existing under the laws of the State of California. All of the issued and outstanding shares of stock of Max have been duly issued and paid for, and no person or entity has been granted any options to acquire any of shares

-5-

EXHIBIT A - 019

of Max.

7.3 This Agreement, and all of the actions contemplated hereunder, have been duly approved by the Board of Directors of Max. Neither the execution nor the performance of any of the actions required of Cure shall cause the breach of any agreement, or the acceleration or cancellation of any indenture or indebtedness to which Max is a party. The persons executing this Agreement on behalf of Max have been authorized to do so, and have done so in their official capacities and within the scope of their authority.

7.4 To the best of Max's knowledge, there are no claims, suits or proceedings which have been brought or which are pending or threatened relative to the conduct of Max's business or operations.

8 Anti-Dilution. The parties hereto acknowledge that Max has previously acquired an amount of the shares of common stock of Cure such that following the issuance of such shares (herein, the "Shares"), Max owned fifteen percent (15%) of all of the issued and outstanding shares of common stock of BLK Holdings LTD., which owns one hundred percent of the issued and outstanding shares of Cure. Cure represents and warrants unto Max, which representation and warranty shall survive the Effective Date, that in the event that Cure undergoes any merger, consolidation, stock split, reverse stock split, reorganization, distribution of shares, stock dividend, recapitalization or any similar event, then Max shall receive additional or replacement shares such that following such event, Max shall own fifteen (15%) percent of the fair market value of all of the shares of Cure or any resulting entity.

8.1 In the event that Cure sells, distributes or exchanges any of its shares of stock, such that following such distribution the net book value per share of Max's shares is caused to decrease, then Cure shall issue additional shares to Max such that the aggregate net book value of all of Max's shares of Cure shall not be less than it was prior to such sale, distribution or exchange.

6

8.2 All of the duties of Cure contained in this Section 8 shall survive the Termination Date.

9.  Non-Disclosure.  The parties hereto represent and warrant unto each other that during the Term of this Agreement each shall obtain possession of technical and financial information of the other which is of a proprietary nature, constitutes trade secrets, and would damage the business of the other if disclosed.  Accordingly, each party hereto represents unto the other that it will treat all technical and financial of the other as confidential and secret, and will not disclose such information to any third party without the prior consent of the other.  Neither party hereto shall use the information provided to it by the other for any purpose except in pursuance of the purposes of this Agreement.   In the event of the termination of this Agreement, each party hereto shall return any documentation, documents or other trade secrets of the other party to such other party.

10.  Term.  The Term of this Agreement shall commence on the Effective Date, and shall continue for a period of twenty-four consecutive months, and shall continue for from year to year unless terminated earlier.  In the event Max elects to terminate this Agreement, the Agreement shall be deemed terminated sixty days following the receipt of such notice of termination by Cure (herein, the "Termination Date").  Following the Termination Date, none of the duties, rights and obligations contained herein shall be binding upon the other.  The Effective Date of this Agreement shall be the date upon which each of the parties hereto shall have executed this Agreement.

11.  Miscellaneous Provisions

11.1  Effect of Headings.  The subject headings of the sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

- 7 -

EXHIBIT A  -  021

11.2  Entire Agreement; Modification, Waiver   This Agreement constitutes the entire agreement among the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the parties.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

11.3  Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.4  Parties in Interest.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

11.5  Assignment.  Cure may not assign this Agreement, in whole or in part, without Max's prior written consent and any assignment without such consent shall be null and void.

11.6  Specific Performance; Waiver of Rescission Rights.  Each party's obligation under this Agreement is unique.  If any party should default in its obligations under this Agreement, the parties each acknowledge that it would be extremely impracticable to measure the resulting damages; accordingly, the nondefaulting party or parties, in addition to any other

- 8 -

EXHIBIT A  -  022

available rights or remedies, may sue in equity for specific performance, and the parties expressly waive the defense that a remedy in damages would be adequate.

11.7  Recovery of Litigation Costs.  If any legal action or arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in the action or proceeding, in addition to any other relief to which it or they may be entitled.

11.8  Nature and Survival of Representations and Obligations.  All representations, warranties, covenants and agreements contained in this Agreement, or in any instrument, certificate, opinion, or other writing provided in it, shall survive the Effective Date.

11.9  Notices.  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered and certified, postage prepaid, and properly addressed as follows.

To: Cure:

To: Max:      Merchant Max

20121 Ventura Blvd. Suite 317,

Woodland Hills, CA 91364

Attention: Avi Chesed

9

EXHIBIT A  -  023

11.10 Jurisdiction; Governing Law. In the event that Cure brings an action to interpret or enforce any provision of this Agreement, Max hereby agrees to the personal and subject matter jurisdiction of the courts of British Columbia. In the event that Max brings an action to interpret or enforce any provision of this Agreement, Cure hereby agrees to the personal and subject matter jurisdiction of the courts of California. This Agreement shall be construed in accordance with, and governed by, the laws of the forum state or province as applied to contracts that are executed and performed within that state or province.

11.11 Severability. If any provision of this Agreement is held invalid or unenforceable by any court of final jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid, enforceable, and binding on the parties.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it on the day and year first above written.

Merchant Max, Inc..                     Cure Technologies, Inc.

Signature: _____       Signature _____
Name: _____             Name _____
Title: _____            Title _____
Date: _____             Date _____

–10–

EXHIBIT A  -  024